UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* TIMOTHY SALAZAR, | ) | |
| and | ) | |
| TIMOTHY SALAZAR, | ) | |
| Plaintiffs, | ) | No.: 1:13-cv-00519 |
| v. | ) | |
| KATHY MCDONALD, | ) | June 4, 2013 |
| Defendant. | ) | |

**COMPLAINT**

## I. PRELIMINARY STATEMENT

1. Qui tam plaintiff Timothy Salazar resides in Albuquerque, New Mexico earning about $11,700.00 annually. Due to his limited income, he is eligible for rental assistance through a federal rent subsidy program called the Housing Choice Voucher Program (HCV) program, more commonly known as Section 8. The program provides that a participating tenant, renting privately-owned housing, pays about 30 percent of his adjusted monthly income toward the rent and utility costs, while the plaintiff United States of America, acting through a local public housing agency, pays the balance of the rent directly to the landlord. Defendant Kathy McDonald is plaintiff's former landlord. Defendant was party to both a rental agreement with plaintiff Salazar and a Housing Assistance Payments Contract (the "HAP Contract") with Albuquerque Housing Services (now known as Albuquerque Housing Authority, and hereinafter referred to as "AHA") subsidized by the Section 8 program. Defendant violated federal law by demanding from

plaintiff Salazar additional monthly payments that were in addition to the payments permitted under the HAP Contract and threatening to evict him if he did not comply. The defendant's actions caused Mr. Salazar to suffer economic harm and emotional distress.

2. This action is brought under the False Claims Act, 31 U.S.C. §3729, *et seq*.

3. The United States seeks all remedies available under the False Claims Act.

## II. PARTIES

4. Plaintiff Timothy Salazar was a tenant of the defendant at premises located at 1407 6th Street, Albuquerque, New Mexico 87102 (the "Premises) from on or about February 1, 2012 to May 30, 2012.

5. Plaintiff United States of America is *ex rel.* Timothy Salazar.

6. Upon information and belief, and at relevant times, defendant Kathy McDonald has owned, managed or controlled the 'Premises", has resided in Albuquerque, New Mexico and has been engaged in commerce by leasing a dwelling unit there.

## III. JURISDICTION

7. This Court has jurisdiction over the federal claim pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732.

8. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## IV. HOUSING CHOICE VOUCHER PROGRAM (SECTION 8)

9. The HCVP is a federal program intended to assist low-income families in obtaining decent, safe, sanitary, and affordable housing and is authorized by Section 8 of the U.S. Housing Act of 1937, 42 U.S.C. §1437f. Regulations governing HCVP are contained in 24 C.F.R. Part 982.

10. The United States Department of Housing and Urban Development ("HUD") administers the program.

11. HUD enters into annual contribution contracts with public housing agencies such as AHA.

12. Pursuant to an annual contribution contract, the public housing agency ("PHA") enters into a HAP Contract with the landlord of a dwelling unit to make monthly housing assistance payments ("HAP Payments") on behalf of an eligible tenant family.

13. The landlord simultaneously enters into a lease for the dwelling unit with the family.

14. The HAP Contract establishes the initial lease term and initial monthly total rent.

15. The HAP Contract establishes the amount of the HAP Payment from the PHA to the landlord, calculated in accordance with the regulations.

16. The HAP Contract provides that the tenant is responsible for paying the landlord the balance of the rent not covered by the HAP Payment.

17. Usually, the family pays 30 to 40 per cent of their adjusted monthly income toward the rent and utilities, while the PHA pays the balance. 24 C.F.R. Part 982.

18. The sum of the HAP Payment and the tenant's share of the rent payable to the landlord is known as the "Contract Rent." The landlord may not increase the Contract Rent during the initial lease term. In subsequent terms, the landlord may not increase the rent without approval from the PHA.

## V. STATEMENT OF FACTS

19. At all times hereafter mentioned, plaintiff Salazar received housing assistance from AHA under the Section 8 Program.

20. On or about January 2011, plaintiff Salazar and defendant reached an agreement for the rental of the Premises, subject to approval of AHA. On or about January 10, 2011, plaintiff and defendant signed and submitted to AHA a Request for Tenancy Approval, form HUD-52517. (A true and correct copy of the Request for Tenancy Approval is attached as Exhibit 1 and incorporated by reference.)

21. In the Request for Tenancy Approval, defendant proposed to provide and pay for all water usage.

22. AHA approved the Request for Tenancy Approval.

23. On or about January 23, 2011, defendant entered into a HAP Contract with AHA. (A true and correct copy of the HAP Contract is attached as Exhibit 2 and incorporated by reference.)

24. In the HAP Contract, defendant agreed to provide and pay for all water usage. Exhibit 2, page 2.

25. In the HAP Contract, defendant agreed that the lease would be consistent with the HAP Contract with regard to utilities paid for by defendant. Exhibit 2, at 4, ¶ 5(c).

26. In the HAP Contract, defendant agreed that she did not have a right to receive HAP Payments unless she complied with all provisions of the HAP Contract. Exhibit 2, at 4, ¶ 7(b).

27. In the HAP Contract, defendant certified that "[e]xcept for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term." Exhibit 2, at 5, Part B, ¶ 8(d).

28. In the HAP contract, defendant agreed that she "may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent the owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease." Exhibit 2, at 7, Part C, ¶ 5(e).

29. In the HAP Contract, defendant agreed that she "must immediately return any excess rent payment to the tenant." (Exhibit 2, at 7, Part C, ¶ 5(f).

30. On or about February 1, 2011, plaintiff Salazar and defendant entered into a written lease for the Premises. (A true and correct copy of the lease is attached as Exhibit 3 and incorporated by reference.)

31. The initial term of the lease was one year from February 1, 2011 through January 31, 2012. Exhibit 2, at 1, ¶ 5; Exhibit 3, ¶ 1.

32. The Contract Rent was $744.00 per month. Exhibit 2, at 1, ¶ 6; Exhibit 3, ¶ 2.

33. Plaintiff Salazar paid defendant a damage deposit of $500. Exhibit 3, ¶ 3.

34. Pursuant to the HAP Contract, AHA was to pay defendant $552.00 per month for the HAP Payment, and plaintiff Salazar was to pay defendant the remaining $192.00 per month as plaintiff's portion of the rent. Exhibit 2, at 1, ¶ 7.

35. AHA agreed to the Contract Rent and calculated the HAP Payment amount, in part, based on defendant's agreement to pay for utilities.

36. Plaintiff Salazar occupied the Premises from February 1, 2011 until May 30, 2012.

37. AHA paid defendant sixteen (16) HAP Payments of $552.00 each per month from February 2011 to May 2012.

38. Throughout plaintiff Salazar's participation in AHA's Section 8 Program, AHA had an annual contribution contract with HUD pursuant to which HUD provided the money to AHA to pay housing assistance to the defendant on plaintiff Salazar's behalf.

39. Plaintiff Salazar paid defendant his portion of $192.00 per month from February 2011 to May 2012.

40. In violation of the HAP Contract, defendant demanded, and plaintiff Salazar paid, additional amounts above the $192 monthly.

41. Counsel's initial investigation reveals that defendant demanded, and plaintiff Salazar paid the following additional amounts:

a. $50 for June 2011
b. $50 for July 2011
c. $50 for August 2011
d. $100 for September 2011
e. $50 for October 2011
f. $50 for November 2011
g. $107 for December 2011
h. $107 for February 2012
i. $107 for March 2012

42. Upon information and belief, defendant demanded and plaintiff Salazar paid monthly amounts for water or rent in addition to those listed above.

43. Plaintiff Salazar paid these additional amounts because he was afraid he would be evicted and then lose his section 8 voucher if he did not pay them.

44. By notice dated March 12, 2012, defendant demanded that plaintiff Salazar pay an additional $573.32 or be evicted. (A true and correct copy of the March 12, 2012 notice is attached as Exhibit 4 and incorporated by reference.)

45. Beginning with the April 2012 rent payment, plaintiff Salazar refused to pay the additional rent demanded by defendant.

46. Defendant threatened to lock plaintiff Salazar out of the Premises and take all of his belongings if he did not pay the additional rent.

47. Plaintiff Salazar subsequently gave a 30 day written termination notice to defendants, terminating the lease effective May 31, 2012.

48. On May 30, 2012, one day before the end of the lease, defendant changed the locks to the Premises.

49. At that time the apartment was clean and undamaged, reasonable wear and tear excepted.

50. If plaintiff Salazar had not been locked out one day early, however, plaintiff would have performed any additional cleaning or repairs that were necessary.

51. Defendant did not return to plaintiff Salazar his damage deposit within 30 days of his moving out of the Premises.

52. Defendant did not send plaintiff Salazar an accounting of deductions from the deposit.

53. On or about April 24, 2013, plaintiff Salazar, through counsel, demanded that the defendant return the additional rent payments and damage deposit and compensate him for the illegal lockout. Defendant refused to return the additional rent payments and damage deposit or compensate plaintiff Salazar for the lockout.

## VI. FIRST CAUSE OF ACTION: VIOLATION OF FALSE CLAIMS ACT

54. The False Claims Act ("FCA") provides that any person who "knowingly presents...a false or fraudulent claim for payment or approval" to the United States is liable on each such claim for a civil penalty of not less than $5000 and not more than $10,000, plus three times the amount of damages sustained by the United States. In addition, any person who violates the FCA is liable for the costs of the civil action brought to recover such penalty of damages. 31 U.S.C. §3729(a).

55. The FCA defines the term "knowing "and "knowingly" as meaning, with respect to information, that a person "(1) has actual knowledge of the information: (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. §3729(b).

56. The FCA defines a "claim" as "any request or demand … for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. §3729(c).

57. Defendant knowingly endorsed and presented for payment at least nine (9) and as many as fourteen (14) separate HAP Payment checks from AHA totaling at least $4,968.00 and as much as $7,728.00 while receiving additional payments from plaintiff Salazar.

58. The United States suffered damages of at least $4,968.00 and as much as $7,728.00 as a result of violations of the False Claims Act, because the money that HUD disbursed to

the AHA for payment of Section 8 housing assistance would not have been paid to the defendant absent her false claims and misrepresentations.

59. Each instance where defendant endorsed and presented for payment a HAP Payment check while knowingly receiving additional rent payments from plaintiff constitutes a separate false claim or representation against the United States that she did not receive any other consideration for the rented premises for that month, as set forth in the HAP Contract at Part B, paragraph 8(d).

60. The United States is entitled to triple the amount of actual damages.

61. The United States is entitled to a civil penalty of not less than $5,000 or more than $10,000 for each of these 14 false claims.

## VII. SECOND CAUSE OF ACTION: BREACH OF CONTRACT

62. Defendant breached the agreement between plaintiff Salazar and defendant by charging and accepting payments for amounts that were defendant's responsibility.

63. As a result of this breach, defendant was damaged.

64. Defendant is liable to plaintiff Salazar for damages, costs and attorney fees for breach of the lease agreement. N.M.S.A. §§ 47-8-6 and 47-8-48(A).

## VIII. THIRD CAUSE OF ACTION: UNLAWFUL REMOVAL AND DIMINUTION OF SERVICES.

65. Defendant's threat to lock out plaintiff Salazar and take his belongings constituted an unlawful removal and diminution of services in violation of N.M.S.A. § 47-8-36.

66. Defendant's changing of the locks on May 30, 2012 constituted a second and separate act of unlawful removal and diminution of services.

67. Defendant is liable to plaintiff Salazar for a civil penalty of twice the contract rent (2 x $744), or a total of $1488 for each act of unlawful diminution of services, plus damages, attorney fees and costs. N.M.S.A. §§ 47-8-36 and 47-8-48(A).

## IX. FOURTH CAUSE OF ACTION: RETURN OF DAMAGE DEPOSIT

68. Plaintiff Salazar is entitled to return of his damage deposit.

69. Defendant's retention of the deposit was in bad faith.

70. Defendant is liable to plaintiff Salazar for the $500 damage deposit, a $250 civil penalty for bad faith, attorney fees and costs. N.M.S.A. §§ 47-8-18 and 47-8-48(A).

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Timothy Salazar and the United States of America respectfully request the following relief:

A. Find that the defendant violated the False Claims Act and is liable to the United States of America.

B. Assess a civil penalty against the defendant for each separate violation of the False Claims Act in the amount of not less than $5,000 or more than $10,000.

C. Award the United States three times the amount of damages that it sustained as a result of the defendant's acts.

D. Award Timothy Salazar the *qui tam* plaintiff's share of the proceeds or settlement pursuant to 31 U.S.C. §3730 (d).

E. If the United States government does not proceed with the False Claims Act action, award costs and reasonable attorneys fees to Timothy Salazar.

I. Award Timothy Salazar damages, interest, civil penalties, costs and reasonable attorney fees for his state law claims.

J. Grant whatever other relief is proper.

Respectfully submitted,

NEW MEXICO LEGAL AID

BY: Thomas Prettyman
Attorneys for Plaintiff Timothy Salazar
Post Office Box 25486
Albuquerque, New Mexico 87125
Telephone: (505) 243-7871
Fax: (505) 842-9864
Email: thomasp@nmlegalaid.org